[Cite as *State v. Blair*, 2024-Ohio-348.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO

    Plaintiff-Appellee

-vs-

LIONELL BLAIR, III

    Defendant-Appellant

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. John W. Wise, J.
Hon. Craig R. Baldwin, J.

Case No. 2023 CA 00055

O P I N I O N

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Criminal Appeal from the Court of Common Pleas, Case No. 2022 CR 02104 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | February 1, 2024 |

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
PROSECUTING ATTORNEY
LISA A. NEMES
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

GEORGE URBAN
116 Cleveland Avenue, NW
Suite 808
Canton, Ohio 44702

*Wise, J.*

**{¶1}**    Appellant Lionell Blair, III, appeals his convictions on one count of attempted murder, with a firearm specification and two counts of Felonious Assault, with accompanying firearm specifications, entered in the Stark County Court of Common Pleas following a jury trial. Appellant was also convicted of two counts of having weapons while under disability and three repeat violent offender specifications, following a bench trial.

**{¶2}**    Appellee is the state of Ohio.

<u>STATEMENT OF THE FACTS</u>

**{¶3}**    For purposes of this Opinion, the relevant facts and procedural history are as follows:

*First Incident – September 13, 2022*

**{¶4}**    On September 13, 2022, at approximately 10:30 p.m., Appellant Lionell Blair, III, his girlfriend Z.J., and her three-year old son were travelling in Z.J.'s car. (T. at 242-243). Z.J. drove, while Blair sat in the passenger seat and her child sat in the back seat. (T. at 243). They had not driven far before Z.J. and Blair got into an argument. (T. at 243). Z.J. believed Blair was talking to another female on the phone, so she told him to get out of her car. (T. at 244). Blair exited Z.J.'s car near the intersection of 11th and Walnut, next to the Community Life Center Church across the street from Z.J.'s apartment. (T. at 244-245). Z.J. pulled up to the stop sign and was planning to go home and lock her doors because she was not sure whether Blair would go to her house. (T. at 245-246). As she sat at the stop sign, she started hearing gunshots. *Id.* She heard multiple gunshots but could not recall how many. (T. at 247). The back window of her car

shattered. (T. at 246). She looked back to check on her child in the back seat. *Id.* The child was frightened but not injured and stated "L -- L shot -just shot your window." (T. at 247, 253). "L" is how the child referred to Lionell Blair. (T. at 247). Z.J. was so scared that she drove off heading north on Walnut, the wrong way on the one-way street. (T. at 248, 252). Although she had not seen Blair with a gun that particular evening, Z.J. had "known him to carry guns." (T. at 247). Z.J. believed Blair was shooting at her and her child. *Id.* Blair later claimed in a text message to Z.J. that "he was shooting in the air, not at [her] car." (T. at 247). Z.J. made her way to his grandma's house on 6th Street, who convinced her to call the police. (T. at 248).

{¶5} Officer Chad Rohr, who, at the time of the incident was employed by the Canton Police Department, was on patrol the night of September 13, 2022. (T. at 213). He responded to 1866 6th Street in Canton around 10:48 p.m. regarding a reported shooting. (T. at 214). There he met with Z.J. and her child. (T. at 214, 217). Z.J. told Officer Rohr that she and her child were in her vehicle when "[t]hey were shot at while they were in the [1100] block of Walnut Avenue, N.E." (T. at 214-215). According to Z.J., the shooting occurred near the intersection of 11th and Walnut in a parking lot across the street from Community Life Center Church. (T. at 215-217). Z.J. identified Blair as the shooter. (T. at 216).

{¶6} Z.J. told police that Blair may be inside her residence. (T. at 218). Officers went to Z.J.'s apartment at 1121 Walnut to look for Blair and discovered the apartment was locked. (T. at 218, 232). Officer Rohr observed that Z.J.'s vehicle, a 2009 Ford Escape, had sustained some damage, including the rear window which "was completely shattered." (T. at 215, 217, 219-220). He checked the car for bullet fragments but found

none inside the vehicle. (T. at 219). Among the many items in the back of Z.J.'s car, Officer Rohr observed a cardboard box with what appeared to be a bullet hole, however they were unable to locate a bullet. (T. at 220, 251).

{¶7}   Officers, including Officer Rohr, went to the scene of the shooting at 11th and Walnut where they "located six .22-caliber Remington Rimfire casings, as well as shattered glass on the north side of the intersection." (T. at 218-219, 221-222). He collected those shell casings and took them into evidence. (T. at 226-229). Officer Rohr confirmed that the location of the shell casings and shattered glass was consistent with Z.J.'s direction of travel at the time of the shooting being north on Walnut. (T. at 232).

{¶8}   The shell casings were sent to the crime lab for testing. (T. at 229). The lab determined all of the spent casings were fired from the same gun. (T. at 450).

{¶9}   Shortly after this incident, Blair started messaging Z.J. to tell her he missed her. (T. at 254). Z.J. loved Blair and the two "ended up linking back up", with Z.J. even agreeing to "try to get him out of trouble." (T. at 254, 300). Z.J. quickly came to regret agreeing to see Blair again because when she woke up in the morning, she realized he left with her car and her phone. (T. at 255-256).

*Second Incident - September 26-27, 2022*

{¶10}  On the evening of September 26, 2022, Z.J. was at a friend's house while she was texting with Blair and agreed to meet him at her home. (T. at 258). Blair had spent the previous night at Z.J.'s apartment, along with his cousin, Robert Julius Clark, and Clark's son. (T. at 258, 265, 280, 384). Z.J. assumed Blair was "coming to spend the night because it was so late." (T. at 258). Blair texted Z.J. that he was "coming home," instructed her to go home, and told her to make sure he could get in. (T. at 259-260). Z.J.

replied, "Okay, babe" and headed home around 11:30 p.m. (T. at 260). Blair arrived at Z.J.'s apartment driving a car that belonged to the mother of another woman he had been seeing. (T. at 260-261). Clark, Blair's cousin, came into the apartment with him. (T. at 280). Clark acknowledged that he was present that night but claimed that he did not have a gun. (T. at 385). Clark testified that Blair was wearing a black shirt that night. *Id.*

{¶11} Z.J. confronted Blair about the car he was driving, and the two "kind of argued a little bit[.]" (T. at 261). Blair then went into Z.J.'s room and after he was in there for a while, she went in and saw that he was packing his clothes. (T. at 262). Z.J. became angry, assuming Blair was taking his clothes to the other woman's house, and the two started arguing again. *Id.* Blair walked out of Z.J.'s room and into the kitchen, but before Z.J. could shut the door, Blair told her "he was done playing with [her,]" and reached into his pocket to grab his gun. (T. at 262-263). Z.J. put up her hand and told Blair she was sorry. *Id.* He pointed the gun at her and fired a couple of rounds. *Id.* Z.J. believes that was when he shot her in the hand. *Id.* Z.J. turned and started running from Blair, making it just out of her kitchen before she collapsed. (T. at 263). She was pretty sure one of the bullets hit her in the pelvis just prior to her collapsing. (T. at 281). She was scared and did not know if she was able to get up, so she remained on the ground listening. (T. at 264). Z.J. first thought Blair was leaving, but then she heard him walking toward her. *Id.* Z.J. looked up and saw Blair in the doorway standing over her and pointing the gun at her. (T. at 264-265). Blair started firing the gun again, "just shooting like nonstop[.]" (T. at 265). She saw the first flash from the gun and put her head down but continued to hear "boom, boom, boom, boom, boom, like he just - he like he was trying to kill [her]." (T. at 266). Z.J. decided to act like she was already dead, hoping that would cause Blair to stop shooting at her.

(T. at 265). Z.J. believed Blair would kill her. (T. at 301). Z.J. then heard Blair's cousin Clark say, "L, [alright,] let's go." (T. at 265).

{¶12} Once she heard him leave, Z.J. put her hands to her neck and felt blood. (T. at 266-267). She got up, found her keys and made her way down the steps and struggled to start her car because her hand was injured, managing eventually to start the car with her left hand. (T. at 267, 272-273). She tried to be calm as she focused on getting herself to the hospital. (T. at 273).

{¶13} She recalled that she was speeding down the road toward Aultman Hospital, hoping to be pulled over by the police so that she could get help. (T. at 274). When Z.J. realized she had driven past the hospital, she panicked and jumped out of the car to seek help. (T. at 275). Z.J. first went up to a car at the stoplight to ask for help, but the man drove away. *Id.* Z.J. eventually made her way to two men across the street at Speedway. (T. at 276). One of men agreed to help her and jumped in her car, and "flew" her to the hospital. *Id.* She got out of the passenger seat of her car and went into the hospital with the assistance of a wheelchair. (T. at 283-284).

{¶14} Traffic cameras tracked by a civilian crime analyst with the Canton Police Department corroborated Z.J.'s account as to how she got from her home to the hospital. (T. at 333-351). Photos taken by officers of Z.J.'s car at the hospital depict a bloody scene: the steering wheel, horn, door handle, and dashboard were covered in blood. (T. at 435-437).

{¶15} Unsure whether she would live or die, Z.J. repeatedly told people in the hospital, "Lionell Blair, III shot me" and "he's at 1320 Gross[,] go get him." (T. at 284-285). Canton police came to the hospital to speak with Z.J., and she told them the same. (T. at

285-286). The address she gave was the home of the other woman Blair was seeing. (T. at 286).

{¶16}  Hospital staff started working on Z.J. immediately. (T. at 285). Z.J. was shot seven times: in the hand, the pelvis, the arm, and three times in the neck and throat. (T. at 269-291).

{¶17}  All told, Z.J. spent approximately three weeks in the hospital as a result of the injuries she sustained. (T. at 286). Shortly after she arrived at the hospital, police took photographs and documented Z.J.'s injuries. (T. at 420-421, 431).

{¶18}  Z.J. testified that's she has scars, "ugly ones" as she describes them, from the seven gunshots wounds. (T. at 268, 270-271). Z.J. testified that the finger on that hand that was shot does not bend. (T. at 269). She had three pins temporarily placed into the finger. (T. at 288). Even with six weeks of therapy, Z.J. still does not have full functionality in her finger. (T. at 289). She has nerve damage in that finger and cannot make a closed fist. (T. at 289). Z.J. also has three scars where Blair shot her in the neck and throat. (T. at 269). She has another scar where Blair shot her in the arm. (T. at 271). The bullet Blair shot into her pelvis remains lodged in her "butt cheek." (T. at 287). Z.J. was unable to walk for two months because of this gunshot wound. (T. at 270). She had to learn to walk again because she was unable to put any pressure on her left leg. (T. at 288). After her initial stay in the hospital, Z.J. fell and fractured her hip. (T. at 287). She lost an inch off of her leg as a result of the required surgery. (T. at 288).

{¶19}  In addition to the physical damage and scars, Z.J. testified that she also suffers with mental health issues as a result of Blair's actions. (T. at 290). She has post-

traumatic stress disorder and depression and is in therapy for these issues. (T. at 290-291). Z.J. has also applied for disability. (T. at 290).

**{¶20}** While Z.J. was in the hospital, Blair, who had access to Z.J.'s login credentials, hacked and posted from her Facebook account proclaiming that he did not do this. (T. at 297-298; 302-303). Then, on October 27, 2022, Blair, while in jail after the incident, made a phone call to T.W., his former girlfriend. (T. at 405, 407). On the call, Blair asked T.W. to "to find somebody to take 15 bands[.]" (T. at 408). She initially took this to mean he wanted her to take $15,000.00 to pay for an attorney. (T. at 408-409). But Blair clarified that he wanted to use $15,000.00 to "finish the job[,]" meaning finish off Z.J., because that would be the only way for him to come home. (T. at 409). Instead, T.W. went to the police and informed them of her conversation with Blair and his request. (T. at 410).

**{¶21}**  Detective Joseph Barnhouse of the Canton Police Department was working the midnight shift from September 26th to the 27th and responded to Aultman Hospital for the reported shooting casualty. (T. at 309-310). When Det. Barnhouse arrived, "there was a lot of pandemonium and everything going on in the trauma bays, nurses and doctors everywhere." (T. at 310). Another officer approached Det. Barnhouse to tell him they needed to get a "dying declaration" from Z.J. *Id.* Det. Barnhouse was told that Z.J. was in bad shape and, "[d]ue to the extent of her injuries being so bad, [they] needed to get what information [they] could as soon as [they] could, [to] try to figure out what happened and how." (T. at 310-311).

**{¶22}**  Det. Barnhouse "momentarily, between all the nurses and doctors working, went in the trauma room and found her laying on the gurney with the gunshots in her

throat[.]" (T. at 311). She was able to tell officers that Blair shot her at her home on Walnut Avenue, and they could find him now at 1320 Gross Avenue. *Id.* She told them Blair's cousin, Clark, had been with him. (T. at 319). Det. Barnhouse sent officers to Z.J.'s apartment and to the address where Z.J. believed they could find Blair. (T. at 312). Along with another officer, Det. Barnhouse continued to interview Z.J., with video and audio recording, to get more details about the shooting. (T. at 312-313). They took inventory of Z.J.'s bloody clothing and took it into evidence. (T. at 313-314).

**{¶23}** Officer Brandon Momirov of the Canton Police Department responded to a report that a female had been shot in the neck. (T. at 357). Upon learning that the suspect, Lionell Blair, III, was inside a home at 1320 Gross Ave, N.E., Officer Momirov and other officers set up a perimeter around the house. (T. at 358-359). The officers gave commands for everyone, including Blair, to come out of the house. (T. at 359). Blair and Clark were among those who came out of the house. *Id.* Blair wore only shorts and shoes when he came outside. (T. at 360). Officers performed a protective sweep of the house and then transported both Blair and Clark to the detective bureau. (T. at 360, 376).

**{¶24}** Officer Momirov then went to 1121 Walnut Avenue, N.E. to process the scene at Z.J.'s apartment. (T. at 364). He took photographs at the scene which depicted blood, drops of blood, and blood smears on the wall. (T. at 364-372). The pictures also depicted spent shell casings from a discharged firearm. (T. at 368-372).

**{¶25}** After taking the photographs, officers collected and documented the spent shell casings and physical evidence to be tested in the crime lab. (T. at 372-373). This included bloody shell casings, an additional five shell casings, and a bullet. (T. at 373-374). These were 9-milimeter shell casings. (T. at 423).

**{¶26}** Detective Travis Krug of the Canton Police Department was the lead detective on the investigation into the shooting. (T. at 414-415). Det. Krug first responded to Aultman Hospital to speak with Z.J. (T. at 417). In addition to coordinating the investigation at the hospital and crime scene, Det. Krug also obtained a search warrant for the 1320 Gross Avenue address. (T. at 422).

**{¶27}** Upon executing the search warrant at the Gross Avenue address, Det. Krug "found several boxes of 9-millimeter ammunition, as well as two handguns chambered in 9-millimeter." (T. at 423, 425). The weapons and ammunition were located in a safe. (T. at 426). One of the officers got the combination to the safe from the homeowner. (T. at 438). He recovered "one Stoeger 9-millimeter handgun and one Taurus 9-millimeter handgun." (T. at 423, 426-427). The magazine of the Stoeger was loaded, but there was no round in the chamber. (T. at 424, 427-428). The magazine in the Taurus was also loaded, and there was a round in that chamber. *Id.*

**{¶28}** Because both Blair and Clark were present during the shooting, officers obtained search warrants to collect DNA from both men and sent those swabs to the lab for analysis and comparison to DNA found on the gun. (T. at 432-433). They sent both the Stoeger and the Taurus to the crime lab. (T. at 434-435. They also sent the shell casings found at Z.J.'s apartment to the crime lab for testing to determine whether those shell casings were fired from either of the guns recovered. (T. at 433-434).

**{¶29}** Det. Krug also located a black sweatshirt at the Gross Avenue address. (T. at 429). That is the black sweatshirt officers believed Blair was wearing when he committed the crime. (T. at 429-430.) They sent the black sweatshirt for testing. (T. at 438). A forensic scientist from the Ohio Bureau of Criminal Investigation ("BCI") analyzed

the black sweatshirt. (T. at 429). She first determined there were no blood stains on the shirt. (T. at 480). She then swabbed the interior collar and tag area of the black sweatshirt. (T. at 480). Although there was a lot of DNA recovered from that swab, it was not of sufficient quality for her to interpret. *Id.*

{¶30} BCI performed a gunshot residue analysis on that black sweatshirt. (T. at 466-467). The analyst "found gunshot primer residue was identified on the samples from the sweatshirt." (T. at 469). The result reflects that the individual wearing the black sweatshirt discharged a firearm. *Id.*

{¶31} Blair's DNA matched the DNA found on one gun: the Taurus. (T. at 434). The crime lab collected eight DNA swabs from the Taurus: from the firearm itself, "the cartridge, the cartridges in the magazine, as well as the magazine with the firearm." (T. at 455). The crime lab sent those swabs to BCI. (T. at 480-481). BCI also received the DNA standard collected from Clark and the DNA standard collected from Blair. (T. at 482-483). Comparison testing excluded Clark as a major contributor for any DNA swabs collected from the firearm, but was inconclusive as to whether he was a contributor of any low-level DNA. (T. at 484, 486). The testing included Blair as a major contributor to one of those swabs. (T. at 485). These results included Blair as a one-in-one-trillion contributor. (T. at 485).

{¶32} The shell casings found in Z.J.'s apartment were a confirmed match with the Taurus. (T. at 435). The crime lab made a comparison of the shell casings recovered from Z.J. 's apartment and determined that the shell casings were fired from the Taurus, not the Stoeger. (T. at 451-452, 458). The spent shell casings were also consistent with the Winchester brand 9-millimeter bullets found in the safe with the guns and the

ammunition remaining in the magazine in the Taurus. (T. at 457). Thus, the results of the testing revealed that the gun with Blair's DNA on it was the same gun that fired the rounds that left the spent shell casings recovered from Z.J.'s apartment. (T. at 435, 451, 457-458).

{¶33} On September 29, 2022, the Stark County Grand Jury returned an indictment, charging Defendant-Appellant Lionell Blair, III, with two counts of Felonious Assault, in violation of R.C. §2903.11(A)(2)/(D)(1)(a), both felonies of the second-degree, each with an accompanying three-year firearm specification under R.C. §2941.145(A), and repeat violent offender specification under R.C. §2941.149(A); two counts of Having Weapons While Under Disability, in violation of R.C. §2923.13(A)(2)(B), both felonies of the third degree; and one count of Attempted Murder, in violation of R.C. §2023.02/§2903.02(B)(D), §2929.02(B) a felony of the first degree, with an accompanying three-year firearm specification under R.C. §2941.145(A), and repeat violent offender specification under R.C. §2941.149(A).

{¶34} On April 24, 2023, the matter proceeded to a jury trial on the felonious assault and attempted murder charges, along with the attendant firearm specifications.

{¶35} The State called eleven witnesses: Officer Chad Rohr, the victim Z.J., Detective Joseph Barnhouse, Hannah Smith, Officer Brandon Momirov, Robert Julius Clark, Theonday Williams, Detective Travis Krug, forensic scientist Abigail Ilijevski, BCI forensic scientist Donna Schwesinger, and BCI forensic scientist Julie Altizer. These witnesses testified and presented evidence as set forth above.

**{¶36}** Following deliberations, the jury returned verdicts finding Appellant guilty on both counts of felonious assault and the accompanying firearm specifications, and the attempted murder charge and accompanying firearm specification.

**{¶37}** On April 27, 2023, a bench trial commenced as to the Having Weapons While Under Disability charges and the repeat violent offender specifications. At the conclusion of the bench trial, the trial court found Appellant guilty on both counts of Having Weapons While Under Disability, as well as the three repeat violent offender specifications.

**{¶38}** On April 27, 2023, the trial court sentenced the Appellant to an indefinite term of incarceration of thirty-five (35) to forty and one-half (40 ½) years.

**{¶39}** Appellant now appeals, raising the following errors for review:

<u>ASSIGNMENTS OF ERROR</u>

**{¶40}** "I. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**I.**

**{¶41}** In his sole assignment of error, Appellant claims his convictions are against the manifest weight and sufficiency of the evidence. We disagree.

**{¶42}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and

ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶43}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶44}** Revised Code §2903.02 defines murder, "No person shall purposely cause the death of another." Attempt is defined by R.C. §2923.02, which provides, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

**{¶45}** Appellant was also convicted of two counts of felonious assault, defined by R.C. §2903.11(A)(2) as knowingly "causing or attempting to cause physical harm by means of a deadly weapon or dangerous ordnance."

**{¶46}** In the case *sub judice*, the jury heard testimony from the witnesses as set forth in detail above, including the victim, Appellant's cousin Julius Clark, Theonday Williams, and the investigating officers. The jury also heard testimony and received evidence regarding the weapons, the shell casings, and DNA as it related to the crime scenes. The jury also heard Appellant's attorney's arguments and explanations about his actions. Thus, a rational basis exists in the record for the jury's decision.

**{¶47}** Appellant herein argues that there is no forensic evidence produced at trial linking him to the September 13, 2023, shooting. As to the forensic evidence produced by the State in relation to the September 27th shooting, Appellant argues that the jury lost

its way in not considering the substantial evidence against his cousin Julius Clark, who was also present at the scene of the crime, and whose own testimony should also not be believed. Appellant also expresses doubt as to the victim's account that she attempted to drive herself to the hospital. Additionally, Appellant argues that his ex-girlfriend's testimony should not be believed.

**{¶48}** While Appellant argues that the jury should not have believed the testimony of the victim, his cousin, or his ex-girlfriend, Appellant fails to point to any actual inconsistent testimony in the record.

**{¶49}** Even if inconsistent testimony had been presented, the jury may take note of inconsistencies and resolve or discount them accordingly, and such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence. *State v. Craig*, 10th Dist. Franklin App. No. 99AP-739, 2000 WL 297252, (Mar. 23, 2000), *quoting State v. Nivens*, 10th Dist. Franklin App. No. 95APA09-1236, 1996 WL 284714, (May 28, 1996).

**{¶50}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197

N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

{¶51} We find that this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter, we find Shanklin's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Appellant's guilt.

{¶52} The jury neither lost his way nor created a miscarriage of justice in convicting Appellant.

{¶53} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of both felonious assault and attempted murder, as well as the attendant firearm specifications.

{¶54} It was for the jury to determine the credibility of the testimony, and in this case, it is not patently apparent that the jury lost its way. Therefore, based on the evidence before this Court as set forth above, we do not find this to be an exceptional case in which the evidence weighs heavily against the conviction.

**{¶55}**   Appellant's sole assignment of error is denied.

**{¶56}**   For the reasons stated in the foregoing opinion, the decision of the Stark County Common Pleas Court is affirmed.


By: Wise, J.

Hoffman, P. J., and

Baldwin, J., concur.


JWW/kw 0126