**[Cite as *State v. Mitchell*, 2025-Ohio-4658.]**

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon., J. Jason P. Smith |
| Plaintiff-Appellee, | : | Hon., J. Michael D. Hess |
| | : | Hon., J. William B. Hoffman |
| v. | : | |
| | : | |
| DAMON ANTHONY MITCHELL, | : | Case No.  2024CA00057 |
| | : | |
| Defendant-Appellant. | : | O P I N I O N |


CHARACTER OF PROCCEDINGS:     Appeal from the Stark County
                              Court of Common Pleas,
                              Case No.2023CR2192


JUDGMENT:                     Affirmed


DATE OF JUDGMENT:             October 8, 2025


APPEARANCES:

For Plaintiff-Appellee

Kyle L. Stone
Prosecuting Attorney
Vicki L. DeSantis
Assistant Prosecuting Attorney
110 Central Plaza South, Suite 510
Canton, Ohio 44702


For Defendant-Appellant

D. Coleman Bond
116 Cleveland Ave. N.W., Suite 600
Canton, Ohio 44702

*Smith, J.*

{¶1} Defendant-appellant Damon Anthony Mitchell appeals the March 29, 2024 Judgment Entry of the Stark County Court of Comon Pleas after a jury found him guilty of Murder with a Firearm Specification, R.C. 2903.02(A)(D)(B)/R.C. 2941.145(A); Discharge of a Firearm on or Near Prohibited Place, Firearm Specification, R.C. 2923.162(A)(3)(C)(4)/ R.C.2941.145(A); and Felonious Assault, Firearm Specification, R.C. 2903.11(A)(D)(1)(a)/R.C.2941.145(A). Plaintiff-appellee is the State of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} On the rainy morning of March 10, 2023, Glenda Troyer, 63, let her dogs outside. When she heard barking, she looked out her front window and saw a newer gold Chevrolet and a young black male walking around her son, Steven A. Troyer's ("son's) car, a red Ford Taurus. Glenda's son had parked his car on Greenfield Avenue in front of her house. At that time, Glenda was married to Steven Q. Troyer, ("Father" or "Husband"). Father and Son had left earlier to go grocery shopping.

{¶3} Glenda called her son and advised him that two unknown individuals were walking around his car. Father and Son returned home. Son immediately encountered an unknown black male. Within moments,

Father was shot near his pickup truck in front of the Troyer home. The unknown individual also discharged a firearm multiple times toward Son and his red vehicle before fleeing the area.

{¶4} Later on March 10, 2023, Trooper Barry Miller of the Ohio State Highway Patrol, ("OSHP"), Bucyrus Post, assisted another officer, Trooper Bice, who had made a traffic stop on U.S. Highway 30 in Crawford County. Trooper Miller was the second unit in a high-speed chase of a gold Chevrolet Malibu which led officers on speeds of over 100 mph at times. A third trooper assisted, and the gold vehicle was eventually stopped. Damon Anthony Mitchell ("appellant"), the driver of the gold vehicle, was taken into custody.

{¶5} On November 3, 2023, appellant was indicted on three counts as follows:

> Count One: R.C. 2903.02(A)(D)(B), Murder, an unclassified felony;
>
> Firearm Specification One: R.C. 2941.145(A);
>
> Count Two: R.C. 2923.162(A)(3)/(C)(4), Discharge of Firearm at or Near Prohibited Premises, a felony of the first degree;
> Firearm Specification One: R.C. 2941.145(A);
>
> Count Three: R.C. 2903.11(A)(D)(1)(a), Felonious Assault, a felony Of the Second Degree; and,
>
> Firearm Specification One: R.C. 2941.145(A).

Appellant was convicted on all counts at a jury trial commencing on March 12, 2024.

{¶6} The trial court ordered that appellant's sentence on each count be served consecutively, for an aggregate minimum prison term of 38 years to life, to a maximum prison term of 43 years to life.[1] This timely appeal of appellant's convictions and sentence followed. Additional facts are set forth below.

ASSIGNMENTS OF ERROR

{¶7} Appellant sets forth four assignments of error for review.

I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED.

II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED.

III. THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES BECAUSE IT DID NOT MAKE THE FINDINGS PURSUANT TO R.C. 2929.14(C)(4) AT THE SENTENCING HEARING, WHICH ARE REQUIRED IN ORDER TO IMPOSE CONSECUTIVE TERMS OF IMPRISONMENT.

---

[1] Appellant's sentence was ordered to be served consecutively to a sentence imposed in Crawford County.

IV. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ALLOWING IMPERMISSIBLE AND IRRELEVANT "OTHER ACTS" EVIDENCE TO BE PRESENTED BY THE STATE.

{¶8} Because the following assignments of error are related, we consider them jointly.

ASSIGNMENTS OF ERROR ONE AND TWO-
SUFFICIENCY OF THE EVIDENCE AND THE MANIFEST
WEIGHT OF THE EVIDENCE

STANDARDS OF REVIEW

{¶9} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. *State v. Rittinger,* 2022-Ohio-4339 ¶ 33 (5th Dist.). "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion." *State v. Thompkins,* 78 Ohio St.3d 380, 390 (1997).

{¶10} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded by State

constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89 (1997).

{¶11} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks, supra.* This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin,* 20 Ohio App.3d 172, 175 (1983). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Thompkins,* 78 Ohio St.3d at 386.

{¶12} In determining whether a conviction is against the manifest weight of the evidence, an appellate court: "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (1986).

{¶13} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins,* 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Id.* at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. *Karches v. Cincinnati,* 38 Ohio St.3d 12, 19 (1988). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Clemons*, 82 Ohio St.3d 438, 444 (1998), citing *State v. Jenks,* 61 Ohio St.3d at 273. Therefore, this Court's "discretionary power * * * should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d at 175 (1983); *See also Otten,* 33 Ohio App.3d at 340.

## LEGAL ANALYSIS

{¶14} Under the First Assignment of Error, Mitchell asserts that his convictions must be reversed due to insufficient evidence because the state failed to meet its burden of proof beyond a reasonable doubt. Mitchell

argues that: (1) he was not identified by any eyewitnesses at the scene; (2) the state did not present DNA or fingerprint evidence connecting him to the offenses; (3) the descriptions given of the suspect did not match; (4) no firearm or ammunition was recovered from him or the vehicle he drove; (5) no evidence showed that Appellant discharged a firearm over a public road; and (6) the timeline of events presented by the state was inconsistent. Under the Second Assignment of Error, Appellant asserts that the jury was confused by the testimony presented to identify him and was misled by the testimony regarding the police chase in another county, thereby creating a manifest miscarriage of justice.

{¶15} For reasons which will follow, we disagree with Appellant's contentions under both assignments of error. We begin by setting forth the testimony and exhibits presented to the jury.

### Glenda Troyer

{¶16} Glenda Troyer is 63 years old. At the time of her husband's death, the Troyers had been married 24 years. Glenda is a survivor of multiple strokes. She has lingering issues with her left leg, but her memory was not affected.

{¶17} Mr. and Mrs. Troyer lived at 1374 Greenfield Avenue,

Canton, Ohio. On March 10, 2023, the Troyers' son arrived between 9:00 a.m. and 9:30 a.m. to visit his parents. Father and Son decided to go to the grocery store and left the house between 10:00 a.m. and 10:30 a.m. After they left, Glenda let their dogs outside. Glenda identified State's Exhibit 35, a photograph of Greenfield Avenue showing a Speedway gas station near the Troyer home.

{¶18} When Glenda heard the dogs barking, she looked outside and saw a newer gold Chevrolet and a young black male walking around and looking at Son's car, a red 2012 Ford Taurus, parked in front of the Troyer home. The unknown male was wearing a white T-shirt, black pants, and a red and white cap, turned sideways.

{¶19} Glenda called Son, and advised him, "There's a couple guys messing with your car." About 15-20 minutes later, Father and Son returned. Glenda initially told officers that she saw two people.

{¶20} Son exited Father's silver Dodge Dakota truck and walked down the street to the unknown male, now inside the gold car. The unknown person got out and they spoke. Glenda couldn't hear what was said. Trees in her yard somewhat obstructed her view.

{¶21} Glenda saw Son get into his own car, back up, and try to move. The unknown male shot at Son's window. Son fled and the unknown male

shot her husband. Because of her health, Glenda could not get to her husband. Glenda's neighbor called 911. By this time, the shooter had gotten into the gold car and left.

{¶22} On cross-examination, Glenda admitted that she told officers on the morning of the shooting that, "it was two guys walking around the car." Glenda reiterated that she told her son, "Two guys are messing with [your] car." Glenda also admitted that a couple of weeks later, she again told officers there were two young males outside the house. Defense counsel questioned Glenda as follows:

> Q: When did you change your mind that it was just one black man? How long ago was it?
>
> A: It wasn't very long because the more I think of it, it's just the one guy that's walking around the car. I didn't see the other one until he pulls his car down and all I seen was somebody rocking.
>
> Q: You see somebody rocking?
>
> A: Yeah.
>
> Q: So when you told the police that you saw two guys, two black men messing with your son's car, that was incorrect?
>
> A: Yes.
>
> Q: And when you called your son and told your son there are two black men messing with your car, that was incorrect?

A:    Yes.

<u>Steven A. Troyer</u>

{¶ 23} Son testified that on March 10, 2023, he got to his parents' house around 9:10 a.m.  An hour or so later, Father and Son decided to go to ReStore, about 5-10 minutes from home.  Son identified Exhibit 21, a video of Father and Son at the store.  They had only been at ReStore for a few minutes when his mother called, informing that two black guys were looking at his car.  Father and Son decided to return home.  The time on the store video footage indicated they left at 10:37 a.m.

{¶24} When they arrived home, Son saw a gold Malibu parked closely in front of his red car, with an unknown, young, black, or biracial male in the driver's seat.  Son walked to his car and the unknown person rolled down the window saying, "Sir, sir."  Son ignored him, started his car, and started to leave.  The unknown person came towards him.  The unknown male told Son:  "I – this is my brother's car.  I need parts off of it."  Then the unknown person went to the front bumper, pointed at the license plate, and said, "[T]his says hot, that was my brother's."

{¶25} Son told the unknown male that he had purchased the car at a used car lot four years ago and the license plates came from the BMV.  Son testified, "He hardly made eye contact.  He was looking… just looking all

around…He gets - -…an attitude like he got irritated. Then he walks back to the passenger side of his car." Son testified his mind "went blank for a split second."

{¶26} Son explained that while he interacted with the unknown male, Father had moved his silver truck so that the driver's windows on Father's truck and the gold car were parallel. By the time Son refocused, the unknown person was in the grass, making eye contact with Son and holding a black firearm. Son testified the unknown male was not acting "normally" but, "as if he was on drugs." Son testified:

> He racks the slide…I sit there, and as before - - before he had went up there, I hear my dad telling him you need to leave, you don't belong here, you need to go. I said I don't have any business with you. You might want to leave. And that's when my mind had went black, and I seen him rack the slide. And I sit there, and then he walks towards my dad after he racks the slide…I see he hold his- - holds his gun up about an arm's length away. The gun is right towards the window, and you can see his entire- - you see the gun, you see his arm, and then he no hesitation pulls the trigger and shoots my dad.

{¶27} Son testified the unknown man pointed the gun at him, inside his car. Son "ducked down and floor it, hit the gas pedal." Son heard gunshots, continuing:

> I still stayed ducked down until I think it's safe to pop back up. I pop back up, I see a bullet hole through my windshield. And then at that moment, I see I'm going towards my neighbor's truck. I turn the wheel as far left

as I can, and it's not moving and then I strike the truck and it bounces me back onto…into the right direction. So then I go towards the left where my wheel has been turned, and I go towards the sidewalk, hit the curb, go over that sidewalk, and then go across the street into Heinemann's Saw's parking lot….My car beeps at me and it shuts down…I sit for a few seconds. I look at my rearview mirror and I seen the car coming. And it drives to the left onto Navarre Road and then when he passes, I run to Speedway…I run in and I yell I need help, someone call 911.

{¶28} Son testified he was in shock. He stayed in Speedway a few minutes and then went to check on his Father. The shooter drove towards Speedway. The prosecutor played video footage obtained from Speedway and Son identified both the red and gold vehicles.

{¶29} Son later told officers at the Canton Police Department ("CPD") that the shooter wore a light gray jacket and a ball cap with a "little bit of red." Son identified Exhibit 14, a light gray jacket, and Exhibit 13, a ball cap as the shooter's clothing.[2] Son testified the shooter was "very skinny," light skinned, "possibly biracial." Son testified the front top of the shooter's head was covered by the hat, but the hair in the back was long, curly, and black. The shooter had a gap between his front teeth and a neck tattoo. Son estimated the shooter's height as five foot eight to six feet tall,

---

[2] All exhibits utilized were State's exhibits.

and weight as between 180 to 200 pounds. Son identified Exhibit 34, his own drawing of the shooter's neck tattoo.

{¶30} Son testified at no time did he see second person at the gold car. The shooter was sitting in the driver's side and exited the driver's side.

{¶31} Son identified Exhibit 8, a bullet he later found behind the passenger seat of his vehicle. On March 25, 2023, Son was called to the CPD to look at a set of pictures and attempt to identify the shooter. The first time Son looked through the photographs he didn't identify anyone.

{¶32} On cross-examination, Son admitted telling Detective Walker, that "it appeared that he had [the gun] on him or the passenger handed it to him." Son explained again that he had "blanked out" when the shooter walked towards his car.

> All I know is that I assumed because of my mother told me that there was two guys, I assumed that there was a handoff. I did not see a handoff.

{¶33} Son also admitted that he stated that the passenger "never got out" of the car. Son also admitted being uncertain about the light gray jacket because he "can't really remember colors that well." When challenged about the discrepancies in his statement and trial testimony, Son testified "My mind was all over the place. I had just been shot at." Son testified, "That's all I can remember, that's the red and I knew he wore a hat."

{¶ 34} Son admitted that the first time he went through the photograph lineup photos he was not very confident and the second time he went through the photographs, that he "didn't know what to say." Son admitted he didn't draw an "O" or "B" on the picture of the neck tattoo.

Patrolman Jamison Gates, Canton Police Department

{¶35} On March 10, 2023, Patrolman Gates was working and overheard the call about the shooting on Greenfield Avenue. Since he was only a few blocks away, he requested dispatch and was the first officer on the scene. Gates saw family members, frantic, outside a truck. A man in the driver's seat, was sitting slumped over, with a lot of blood and matter on his clothing. Gates saw one entry wound on the man's face. Gates soon realized the man's injuries were grave.

{¶36} Gates radioed dispatch to hurry the medics. Gates took pictures of the injured man in the position he was found in the truck. Gates identified Exhibits 17 A-C as photographs of different angles of the truck.

Charles Curtis

{¶37} On March 10, 2023, Charles Curtis had stopped at the Speedway at the intersection of Harrison and Navarre. Curtis was pumping gas when he heard gun shots, a pause, more gun shots, and a crash. He turned and saw a white male driver had hit a telephone pole. Curtis also

identified Exhibit 35, which showed the general area of the Speedway near Greenfield Avenue.

{¶38} As the white male ran towards Curtis, a "brownish kind of like a Chevy Malibu, came down the side street, turned left, and sped away like "0 to 100." The Malibu driver's window was down, and Curtis clearly saw a black or biracial male in his 20's or early 30s. The driver had a "76ers" baseball cap, red, white, and blue. Curtis identified Exhibit 13 as the cap he saw. Curtis identified State's 42, a photograph of the Malibu he saw driving at a high rate of speed.

{¶39} Curtis testified it was "chaotic." Curtis was afraid he would be shot. The Speedway store manager came out and the running man went into the store. Curtis called 911. Curtis wrote a statement for police around 11:11 a.m.

{¶40} The prosecutor played Exhibit 36, a compilation of video footage from different locations the gold car traversed before and after the shooting. The video showed Curtis's vehicle, the white male running after the gunshots, and the Malibu speeding away. Curtis testified the video was an accurate depiction of what he observed on March 10, 2023.

{¶41} The prosecutor next played Exhibit 41, a recording of Curtis's 911 call. Curtis acknowledged that he told the dispatcher that there may be

another person running east. However, Curtis testified he never saw another person.

{¶42} On cross-examination, Curtis admitted that the running man never told him people were shooting at him from a Chevy Malibu. He described the running man as "terrified." Curtis reviewed his written statement and admitted that, in it, he had written that he heard the running man say, "he never seen the two guys before." Curtis clarified that the hat he described was not a "76ers" hat, but only that it was red, white, and blue. Curtis, like Son, failed to identify a patch in the middle of the hat.

{¶43} On redirect, Curtis testified that he didn't observe any other cars driving at a high rate of speed from the Greenfield area. On recross, Curtis admitted that after the white male ran into the store, Curtis crouched down for protection and wasn't actually looking at the street, so he was not aware of any other cars.

### Matthew Verbeck

{¶44} Matthew Verbeck, a Marine Corps veteran, testified that his military background has given him a heightened sense of awareness and that he "pays attention" to his surroundings. On March 10, 2023, Verbeck was employed at Archer Sign, near Greenfield Avenue. On March 23, 2023, Verbeck was visited by Detectives Walker and Diels of the CPD. The

officers told him of a fatal shooting nearby on March 10, 2023. They believed Verbeck had indirect contact with the shooter just prior to the event. At first, Verbeck did not recall anything about the day. The officers prompted him that he had backed into his parking spot that day and it was raining. A few minutes later, Verbeck recalled March 10, 2023.

{¶45} On the day in question, Verbeck was nearing work when another vehicle behind him came up at a "quicker" rate of speed and "exceedingly" close to his bumper. Verbeck turned into the Archer parking lot and started to back into his boss's parking space. As Verbeck was backing, the other car drove by him and the two drivers "locked eyes" for at least four seconds. One parking space was between them. Then, the other car started to leave slowly. Both drivers continued to stare at each other, for 10-15 seconds. Verbeck described the driver as having a light complexion. The driver's eyes and bridge of his nose "stood out" to Verbeck. The other driver slowly left the area.

{¶46} Verbeck considered approaching the other car because the driver looked "lost" or as if he was "possibly up to something." Verbeck also reviewed Exhibit 36, a video clip showing his vehicle in lead. The time on the video is 10:11:33. Verbeck testified that there was nobody else in the car, just the driver.

{¶47} Verbeck was later asked to look at a photograph lineup. He testified he had no doubt that the man he identified in the lineup was the driver he encountered on March 10, 2023. Verbeck identified Appellant from the witness stand.

{¶48 } On cross-examination, Verbeck admitted he didn't know the driver and it appeared that the driver may have been lost. He thought the driver was wearing a white T-shirt or a tan zip up. He wasn't sure if the driver had a face or neck tattoo. He didn't look directly at the driver's neck, but from his peripheral vision, it didn't look normal.

Dr. Daniel Sullivan, Cuyahoga County Medical Examiner's Office[3]

{¶49} Dr. Daniel Sullivan, forensic pathologist and deputy medical examiner, personally performed the autopsy of Steven Q. Troyer on March 11, 2023. Dr. Sullivan directed an examiner's office employee to take pictures of the autopsy. He identified Exhibits 20A-B as accurate depictions of Mr. Troyer's body during the autopsy.

{¶50} Dr. Sullivan observed an entrance gunshot wound on the left side of Mr. Troyer's face. He did not observe any gunpowder particles on the wound, indicating that Mr. Troyer was shot at a distance of greater than

---

[3] All experts were qualified as such during trial. Defense counsel has not challenged their credentials or methodology. Counsel has not raised issues of chain of custody or authenticity. Therefore, for the sake of brevity, we will not address these matters although they may be found in the trial transcripts.

three feet. Dr. Sullivan also observed an exit wound on the right forward side of Mr. Troyer's neck. Upon examination of Mr. Troyer's internal organs, Dr. Sullivan observed hemoaspiration, i.e., blood in the lungs. Dr. Sullivan testified that the gunshot wound perforated the back of Mr. Troyer's throat and severed his right internal carotid artery, a major and fatal injury that contributed to the hemoaspiration and 350 milliliters of blood found in the deceased's stomach.

{¶51} Dr. Sullivan opined to a reasonable degree of medical certainty that Mr. Troyer's cause of death was gunshot to the head with vascular injury. He prepared an autopsy report, which he identified as Exhibit 19. The Stark County Coroner ruled Mr. Troyer's death a homicide, based on the autopsy report. On cross-examination, Dr. Sullivan admitted that he was not a ballistics expert and there was no way for him to know what caliber of bullet was used to shoot Mr. Troyer.

Michelle Snyder, Ohio Bureau of Criminal Investigations (BCI)

{¶52} Michelle Snyder, a forensic scientist, specializes in gunshot residue (GSR) examination. Ms. Snyder identified Exhibit 14, a gray sweatshirt; Exhibit 9, a swab sample of the brim of a hat; Exhibit 13, the hat; and Exhibit 10, two swabbed samples that came from the right and left cuffs of a hoodie. All items were received for GSR testing which was performed

by Donna Schwesinger, now retired. Ms. Snyder was asked to rewrite Schwesinger's report. Snyder examined the notes, reviewed the data, and reached her own conclusions.

{¶53} After reviewing the items, the notes, and photographs, Ms. Snyder opined that to a reasonable degree of scientific certainty, multiple particles of GSR are contained on one of the samples from the outer part of the hat. She opined to a reasonable degree of scientific certainty that there was a single particle of GSR on the left cuff from the gray sweatshirt.

{¶54} On cross-examination, Ms. Snyder admitted there was no way to tell when GSR was deposited on the hat or on the hoodie. She admitted GSR could have been deposited at any time. She could not say that the person wearing the clothing items fired a gun that same day. Snyder explained that the findings mean only that the person wearing the items came into contact with the GSR, and contact could happen in various ways. Snyder admitted that she could not state to a reasonable degree of scientific certainty that Appellant fired a gun on March 10, 2023.

<u>Jeff Weller, Canton Police Department</u>

{¶ 55} Jeff Weller, a member of the CPD crime scene unit, also recalled that it was a rainy day when he went to Greenfield Avenue to collect evidence. Mr. Weller identified Exhibits 17A-F, which included a

silver Dodge Dakota truck; the red Ford Taurus; and yellow placards he collected marking spent shell casings.  Mr. Weller also identified Exhibit 1, a manila envelope with a nine millimeter round;  Exhibit 2, a nine millimeter cartridge casing he collected at the scene; and Exhibit 2A, 13 small manila envelopes with spent shell casings collected.

{¶56} Weller testified that the silver Dakota truck and red Ford Taurus were towed to the city service center from the scene and the vehicles were secured.  On March 11, 2023, Weller went to that location to investigate the vehicles.  Weller identified Exhibits18A-E as pictures of the red Ford with trajectory rods sticking in various holes.  Each rod depicted where a bullet had struck and pierced the vehicle.  Twelve bullet holes were discovered in the red Ford Taurus.

{¶57} Weller identified the following exhibits:  Exhibit 3, bullet fragment collected from the driver's seat; Exhibit 4, bullet fragment collected on the left front driver's floor; Exhibit 5, bullet fragment from the right front headrest; Exhibit 6, bullet fragment from the door post on the right passenger side; and Exhibit 7, a tiny bullet fragment from the left front headrest.

{¶58 } At this point in the trial, prior to Trooper Barry Miller's testimony, the court held a sidebar discussion with the attorneys.  The

prosecution argued that Exhibit 36, a compilation of video showing the high-speed chase of the gold Malibu, which Trooper Miller would be testifying about, was necessary to identify Appellant and the clothing he wore that day. Defense counsel objected to the exhibit in its entirety, based on its possible prejudicial effect. The trial court echoed defense counsel's concerns but agreed that for prosecution purposes, the identification evidence was relevant. The court also noted that evidence of Appellant's flight from the scene was relevant. Therefore, the court and parties spent time editing parts of the compilation video which would not be shown. The court and attorneys took great care to avoid showing Appellant in handcuffs when he was apprehended after the chase.

<u>Trooper Barry Miller, Ohio State Highway Patrol</u>

{¶59} Trooper Miller was working on March 10, 2023, when Trooper Bice radioed for assistance, indicating that he had made a traffic stop on U.S. Highway 30 in Crawford County for speed of 97 mph in a 70 mph zone. Trooper Bice didn't believe the driver was going to "stick around." Trooper Miller immediately headed towards U.S. 30 and joined in a chase.

{¶60} Trooper Miller testified in great detail about the chase, aided by Exhibits 36 and 44. The prosecutor first played Exhibit 44, which Trooper Miller identified as Trooper Bice's body camera footage from the initial

stop. The prosecutor next played video 30 from Exhibit 36, which was the video camera from Trooper Bice's cruiser. This footage showed the pullover to the right side of the road.

{¶61} Trooper Miller was the second unit and stayed behind Trooper Bice. A third trooper eventually joined in and the chase reached speeds of well over 100 mph. The gold car traveled on U.S. Highway 30 past rest areas, exited onto U.S. Highway 23 northbound, exited on S.R. 53 without stopping, and then re-entered U.S. Highway 23, this time southbound. The gold car sometimes reduced speed to 70 mph and then "jumped back" up to "100 mph plus." The gold car was caught after the third trooper deployed spikes twice. Trooper Bice's cruiser hit the gold Chevrolet Malibu "nose to nose." The entire chase took approximately ten minutes.

{¶62} The prosecutor played State's Exhibit 36, video 31, Trooper Bice's in-car video showing the second stop. Miller had brief contact with the driver, who wore a gray sweatshirt and black jeans, as he was removed from the vehicle and taken into custody. Miller identified Exhibits 48A-C, photographs which showed the driver wearing a grey sweatshirt with a white T-shirt underneath and black pants, in the gold car. Trooper Miller identified Appellant in the courtroom as the same person who led officers on the high-speed chase. Miller also identified Exhibits 13, 14, and 15,

respectively, as the hat, sweatshirt, and pants Appellant wore the day of the chase.

{¶63} Trooper Miller was forced to make several admissions on cross-examination. He admitted that Appellant was not six-feet tall or 200 pounds. He also acknowledged that the portion of Route 30 where the chase occurred was mostly farmland and that it was "not uncommon" to stop a vehicle doing 90 miles an hour there.

{¶64} At this point, defense counsel again played Trooper Bice's in-car video footage of the initial stop. Upon review, Trooper Miller admitted that he could hear Appellant tell Trooper Bice that he was "going to stay." Miller admitted that Appellant fled after Trooper Bice reached his left hand downward. He admitted Appellant indicated, after the second stop, that he ran "out of fear." Trooper Miller admitted that at no time did Appellant indicate he ran because he was wanted for murder. He also admitted that no firearms or ammunition were found in Appellant's vehicle. He admitted he did not smell gunpowder or see powder marks on Appellant's face or clothes.

{¶65} At the conclusion of Trooper Miller's testimony, defense counsel renewed his objection to the videos played as part of Exhibit 36. Counsel also moved for mistrial on the basis of the videos, which he argued

allowed the jury to hear and observe evidence of other possible crimes committed by Appellant. The trial court overruled the motion.

<u>Detective Mark Diels, Canton Police Department</u>

{¶66} When Detective Diels of the CPD arrived at the scene on Greenfield Avenue, the shooting victim had already been transported. It was a rainy day, which meant DNA evidence could be lost. Diels found empty shell casings and a wrecked red Taurus. Diels went to Speedway and obtained video footage which showed Son running to Speedway and the gold Malibu driving at a high rate of speed.

{¶67} Detective Diels returned to police headquarters and interviewed Son for 45 minutes. Son described the shooter as "a skinny fucker": biracial, five eight to six feet tall, between 180 and 200 pounds, wearing a gray jacket and possibly red hat. Son also described the shooter as having curly hair, a large neck tattoo with thick bars, and a gap in his teeth. Son first described the person as having no facial hair but later changed it to "peach fuzz." Diels identified Exhibit 34 as the shooter's neck tattoo, with thick bars going around the neck, which Son attempted to draw. Son told Diels he had never seen the person before the confrontation.

{¶68} Exhibit 36, the compilation video footage obtained through Diels' investigation, was utilized during his testimony. To summarize, these

videos showed Appellant on March 10, 2023, going into the Canton South Car Wash about 10:07 a.m. and encountering Matthew Verbeck at Archer Signs at 10:20 a.m. A video from McDonald's showed Appellant exiting onto the U.S.Highway 30 ramp at 10:50 a.m. These videos showed the gold car traveling at an extremely high rate of speed, running a stop sign and a red light, and passing other cars. Initially, Detective Diels did not have a license plate and had no idea of the suspect's identity.

{¶69} However, Diels was able to get a license plate number from the car wash video footage. He ran the plate and discovered it was an Enterprise rental car. He also learned that another officer, out of county, had run the plate on March 10, 2023, around 11:51 a.m. Diels contacted the OSHP and learned the name, Damon Mitchell. Diels called Crawford County and they sent a photograph of Appellant which matched Son's description.

{¶70} Detective Diels notified the prosecutor's office and they advised calling in Son and Matthew Verbeck to do a photo lineup. Diels identified Exhibit 37 as Appellant's photo that was used in the lineup. After identification was made, Diels requested a warrant.

{¶71} Through the course of his investigation Diels obtained clothing and an OSHP report of the Crawford County traffic stop. He learned the gold Malibu was in another county, impounded. Upon search of the gold

Malibu, Diels found a hat, credit card for Betty Graser (Appellant's mother), and a traffic ticket issued to Appellant the day before the shooting incident. Diels identified clothing exhibits and photographs of the cruisers, the gold Malibu, the traffic ticket and the credit card. Exhibits 16 A-J are photographs of the gold Chevrolet Malibu, showing the passenger seat with clothing, hat, and traffic ticket. Diels also identified Exhibits 25 and 26, two cell phones belonging to Appellant.

{¶72} Diels sent the clothing to BCI for GSR testing. The shell casings were sent for DNA testing and came back negative. The cell phones were searched. The phone and gold Malibu did not have GPS technology so Diels could not obtain cell tower locations. Diels also identified photographs showing Appellant wearing the hat and gray hoodie. Diels identified Exhibit 40, an Enterprise rental contract, showing a person named Charles Yelloweyes rented the gold Malibu on March 3, 2023.

{¶73} Diels also testified about State's Exhibit 36, video footage from around the area showing the route that Appellant took prior to and immediately after the shooting at Greenfield Avenue. To summarize, the Speedway camera showed Appellant going into the car wash. The time on the car wash camera was 10:07 a.m. The video footage continued to show Appellant's movements through the area at 10:11 a.m. A video from

Smith's Auto registered the time as 11:15:22 a.m., which Detective Diels testified was a discrepancy due to the time change which had occurred on March 12. Another video obtained from the Polish Club showed Appellant following Verbeck at 10:14. Detective Diels testified the time on the cameras was 4-6 minutes off. A residential camera caught Appellant at 10:20-10:22 a.m.

{¶74} Diels noted that the Speedway camera showed Son running across the street after the shooting at 10:44 a.m. A residential camera caught Appellant driving at a high rate of speed at 10:46 a.m. Footage from a McDonald's near the U.S. Highway 30 exit showed Appellant entering U.S. Highway 30 at 10:50 a.m. Appellant was eventually stopped 83 miles away from Canton. Exhibit 49, Diels testified, was video showing Son crashing his car and the Malibu driving away. The video doesn't show other cars coming out of Greenfield Avenue or any other person walking or running from the area.

{¶75} Diels identified Exhibit 43, a recorded video call of Appellant obtained from one of the cell phones. Detective Diehl identified the voice and the photo, dated March 8, 2023, as Appellant's. Detective Diels testified that on the recorded video call he could hear Appellant say he was "on the bean" which, Diels explained, meant he was taking

methamphetamine. Diels identified Exhibit 39D, a photograph of Appellant, showing the gap in his teeth. Detective Diels identified Appellant in the courtroom as the alleged shooter.

{¶80} On cross-examination, Detective Diels admitted he couldn't recall if the cell phones were Sprint or Verizon. He admitted he didn't try to contact any cell service provider to obtain information on the tower locations, although he had obtained such records in past investigations. He admitted that some of the videos on Exhibit 36 do not show the interior of the gold vehicle, its plates, or the driver.

{¶81} Detective Diels admitted only Glenda and Son were eyewitnesses to the shooting. Diels admitted that he spoke to Son soon after the shooting and he seemed calm. Diels agreed that there was a discrepancy in Son's description of the shooter. He admitted Glenda mentioned two black males and that she didn't mention a gray hoodie, while Son didn't recall black pants. Diels admitted that the 13 shell casings tested yielded no DNA or fingerprint evidence.

{¶82} On redirect, Diels testified they were advised at the start that two persons were involved in the shooting. They looked for evidence of two suspects but never found any evidence of a second person.

Abigail Ilijevski, Canton Stark County Crime Lab

{¶83} Abigail Ilijevski specializes in firearms and fingerprint analysis. Ilijevski was asked to do a cartridge case comparison. Ilijevski identified Exhibit 1 as a 9-millimeter jacketed hollow point Winchester bullet. She identified Exhibit 2A as 13 envelopes, each containing one spent 9-millimeter bullet. She explained that caliber was determined by weighing a bullet and measuring its diameter. Bullets have a copper jacket and when a bullet travels down the barrel of a gun, "lands and grooves" are imparted on the copper jacket. "Lands" are raised portions and "grooves" are lower portions inside the barrel.

{¶84} Ilijeski identified Exhibits 5 and 6, envelopes each containing one piece of deformed jacket material. Exhibit 5 was labeled "RF headrest." Exhibit 6 was labeled "RS center door post." Ilijevski tested these items and was able to determine the caliber of bullet used was a 9-millimeter. She further testified that testing showed Exhibits 1, 2A, 5, and 6 came from a firearm which had six lands and grooves inside the barrel.

{¶85} Ilijevski opined to a reasonable degree of scientific certainty that the 13 9-millimeter cartridges were fired from the same firearm. However, she was not provided with a firearm for testing. Ilijevski further testified that because Exhibits 2A 5 and 6 indicate that because the bullets were spent, the gun that shot them was operable at the time. Ilijevski

explained that sliding the top of a firearm to put it in the position to be fired can be described as "racking a round."

{¶86 } At this point the State rested, subject to admission of exhibits. All in all, the State prepared 49 exhibits which included: one live 9-millimeter round; spent shell casings; bullet fragments; GSR samples; baseball cap, black pants, gray hoodie; photographs as discussed within; videos as discussed within; maps; the coroner's report; two cell phones; photo lineup presentations; rental car agreement; the Curtis 911 call; Appellant's recorded call; and the tattoo drawing. The State withdrew six exhibits. Trooper Bice's body camera video, Google images of Crawford and Wyandot counties, Google image of distance between Canton and where Appellant was first stopped, and still shots of the highway chase video were admitted over Appellant's objection.

{¶87} Defense counsel made a Crim.R. 29 motion, arguing that the neither of the two main witnesses to the shooting, Glenda Troyer and Son, was able to identify Appellant in the courtroom as the shooter. Counsel's motion was overruled. Thereafter, the defense rested.

{¶88} Appellant makes very generalized arguments under the First Assignment of Error challenging the sufficiency of the evidence supporting

his convictions. Therefore, we will address each argument in a similarly broad manner.

{¶89} Appellant was convicted of Count One, R.C. 2903.02(A)/(B), Murder, an unclassified felony, which provides:

(A) No person shall purposely cause the death of another…

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree….

Count Two, R.C. 2923.162(A)(3), Discharge of a Firearm at or Near Prohibited Premises, a felony of the first degree, which provides:

No person shall… [d]ischarge a firearm upon or over a public road or highway.

Count Three, R.C. 2903.11(A), Felonious Assault, a felony of the second degree which provides:

No person shall knowingly…cause or attempt to cause serious physical harm to another…

{¶90} Appellant was also convicted of the accompanying firearm specifications, R.C. 2941.145(A), which provides for a mandatory prison term if a count of an indictment "specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the

firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶91} As to Count One, the State needed to prove that Appellant acted purposely. As to Count Three, the State needed to prove Appellant acted knowingly. R.C. 2901.22, culpable mental states, defines as follows:

(A) A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

(B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Eyewitness Testimony

{¶92} Appellant first points out that he was not identified by any eyewitness at the scene of Mr. Troyer's shooting on Greenfield Avenue. That is true. The trees obscured Glenda Troyer's view from her window and her health prevented her from going to the scene. Likewise, at the photo

lineup, Son was unable to make a strong identification. Son testified that his mind "went blank" just before the shooter "racked his gun" and shot his father. Shortly after that, Son found the person shooting at him. He had to "duck down" in his car as he attempted to leave for safety and thereafter crashed into a telephone pole.

{¶93} However, just prior to the shooting, Appellant encountered Matthew Verbeck who "got a good look at him" and even "locked eyes" for a few seconds. Matthew Verbeck identified Appellant from the witness stand as the person driving the gold car. The video evidence bolstered this testimony. Similarly, Charles Curtis identified Appellant driving the "brownish" car at a high rate of speed. The Speedway video bolsters this testimony. Finally, Trooper Miller, who assisted in the high-speed chase, identified Appellant as the driver of the gold Chevrolet Malibu.

{¶94} The State's case was largely based on circumstantial evidence. We are mindful, however, that circumstantial evidence has the same probative value as direct evidence. *See State v. Chester,* 2021-Ohio-980, ¶ 37 (5th Dist.); *State v. Jenks,* 61 Ohio St.3d 259, 272 (1991), paragraph one of the syllabus, superseded by State constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89, 102 at n.4 (1997). Here, the trial court instructed the jury as to what could be considered as

evidence and instructed as to the difference between direct and circumstantial evidence. We have no reason to believe the jury was not able to follow these instructions.

{¶95} Furthermore, as this Court observed in *State v. Ocasio*, 2019-Ohio-5396, ¶ 45 (5th Dist.), eyewitness testimony is not a required element of these offenses. Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Daniels,* 2019-Ohio-3208, ¶ 24 (5th Dist.). And, as instructed by the trial court, the jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. Indeed, the jury need not believe all of a witness's testimony but may accept only portions of it as true. *Ocasio, supra,* (Citations omitted.)

{¶96} Here, the jurors had the task of evaluating the believability of the various witnesses such as Glenda, Son, Verbeck, Curtis, Miller, and others. The jurors were required to piece together a timeline of the activities of the alleged shooter and then determine if, in fact, Appellant was the shooter. A series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Chester,* ¶ 38, citing *State v. Lott,* 51 Ohio St.3d 160, 168 (1990), citing *Hurt v. Charles J. Rogers Transp. Co.,* 164 Ohio St. 329, 331 (1955). It is obvious that piecing

together the testimony of the witnesses, along with the video evidence, jurors were persuaded beyond a reasonable doubt that Appellant shot Father, shot at Son, and shot over a public roadway.

{¶97} Appellant's argument based on a lack of eyewitness identification at the crime scene is without merit.

### DNA and Fingerprint Evidence

{¶98} Specifically, Appellant points out the state presented no evidence of his DNA or his fingerprints connecting him to the evidence in this case. We need not restate our discussion on direct and circumstantial evidence. We note, however, that neither fingerprints nor DNA evidence is required to support a conviction for any criminal act. *See State v. Wood,* 2022-Ohio-3536, ¶ 31 (5th Dist.). Thus, this argument is also without merit.

### Inconsistencies in Evidence

{¶99} We have grouped Appellant's challenges to various inconsistencies in the evidence. Appellant first argues that the descriptions witnesses gave of him did not match. In particular, Son testified that the shooter was "very skinny," 180 to 200 pounds, and told Detective Diels he was a "skinny fucker," while Trooper Miller testified that Appellant was not six feet tall and did not put his weight at 180 to 200 pounds. The evidence also shows that Son failed to draw an "O" or "B" on the neck tattoo.

{¶100} In *State v. Locke*, supra, this Court noted that while there were inconsistencies in the witness' descriptions of the clothing that the alleged perpetrator was wearing, the jury, as trier of fact, was in the best position to assess their credibility. *Id.* at ¶ 32. Even where inconsistent testimony is presented, a jury may take note of inconsistencies and resolve or discount them accordingly, and such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence. *State v. Blair*, 2024-Ohio-348, ¶ 49 (5th Dist.) (Citations omitted.) Again, piecing the events and the evidence together, the jury clearly found the evidence as to Appellant's identification credible, despite the inconsistencies in the description of Appellant and his clothing. *See also Chester,* ¶ 42. This argument is without merit.

{¶101} Appellant next points out that no firearm or ammunition was recovered on his person or from his vehicle when he was apprehended. Admittedly, Abigail Ilijevski testified there was no firearm submitted to her for testing. However, the fact that no firearm was produced in this matter is not fatal to any of the counts. The state produced circumstantial evidence that a firearm was used to shoot Father and Son, and that the shooting occurred in the Greenfield Avenue area. Furthermore, Ilijevski concluded,

based on her cartridge comparison testing, that whatever firearm was used at the time of the shooting was operable.  This argument is also without merit.

{¶102} Finally, Appellant points out that the timeline of events presented by the State was not consistent.  These inconsistencies were fleshed out by the testimony of Detective Diels who obtained video footage from locations the gold car traveled prior to the shooting on Greenfield Avenue and then afterwards when the gold car quickly sped away, eventually onto U.S. Highway 30.  Diels explained that the video from the Polish Club was "off 4-6 minutes" and that the video from Smith's Auto was off by one hour due to the Daylight Savings time change.

{¶103} Once again, we are mindful that inconsistencies are to be resolved by the trier of fact.  As indicated earlier, the prosecutor pieced together a timeline of events occurring before, during, and after the shooting.  The jury obviously found the State's theory of the case, timeline included, credible and persuasive.  Based on the foregoing, we find no merit to this argument.

No Evidence Gun Discharged Over Public Road

{¶104} Appellant argues there is no evidence he discharged a firearm over a public roadway, as indicted in Count Two.  Here, Son testified that the unknown male, later identified as Appellant, shot his father while he was

in his truck parked on Greenfield Avenue. Son testified that Appellant fired shots at him as he attempted to escape in his red car, also parked on Greenfield Avenue. Charles Curtis testified Appellant was firing shots as he sped past the Speedway. Detective Diel and Jeff Weller found spent shell casings on the ground and bullet holes in the red car. Based on this circumstantial evidence, the jury could reasonably infer that Appellant discharged a firearm over a public road. This argument is also without merit.

{¶105} Having reviewed all the trial transcript of witness testimony, physical exhibits, and documentary evidence, and construing the evidence in a light most favorable to the prosecution, we find any rational trier of fact could have found all essential elements of the three counts proven beyond a reasonable doubt. Thus, Appellant's First Assignment of Error is without merit and is hereby overruled.

{¶106} Under the Second Assignment of error, Appellant challenges the weight of the evidence supporting his convictions. Appellant asserts first, that the jury was confused by the testimony presented to identify him, and second, that the jury was misled by the evidence of the police chase which occurred in another county. For these reasons, he contends that manifest miscarriage of justice has occurred. We must disagree.

{¶107} Having reviewed the entire trial transcript, weighed the evidence and all reasonable inferences, considered the credibility of the witnesses, and having determined whether or not in resolving conflicts in the evidence, the trier of fact lost its way, we find that Appellant's convictions are not against the manifest weight of the evidence. We do not find that the jury lost its way and created a manifest miscarriage of justice. As such, the Second Assignment of Error is without merit and is hereby overruled.

{¶108} For ease of analysis, we next consider Assignment of Error Four.

### ASSIGNMENT OF ERROR FOUR - ADMISSION OF "OTHER ACTS" EVIDENCE

### STANDARD OF REVIEW

{¶109} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake City,* 58 Ohio St.3d 269, 271 (1991). *See also State v. Hare*, 2024-Ohio-208,¶ 13 (5th Dist.); *State v. Romy,* 2021-Ohio-501, ¶ 49 (5th Dist.). The appellate court must limit its review of the trial court's admission or exclusion of evidence to whether the trial court abused its discretion. *Rigby, supra*. The abuse of discretion standard is more than an error of judgment; it implies the court ruled arbitrarily, unreasonably, or

unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217(1983). "When applying the abuse-of-discretion standard, a reviewing court must not substitute its judgment for that of the trial court." *In re E.L.C.,* 2015-Ohio-2220, ¶ 16 (12th Dist.).

## LEGAL ANALYSIS

{¶110}} Appellant contends that the trial court erred to his prejudice by allowing the state to present evidence from the high-speed chase in which he led officers into Crawford County. The State presented video evidence of the chase which occurred over one hour after the shooting in Stark County. Appellant argues that the State had already presented the clothing he wore during the incident and the trooper involved testified about the chase. As a result, Appellant argues the video evidence was unnecessary and duplicative. Appellant also argues that while the trial court excluded evidence of his conviction as a result of the chase, it nonetheless became clear to the jury that he was in fact charged, arrested, and incarcerated because of the chase. Appellant contends that the evidence related to the chase was presented only as improper character evidence. Appellant concludes the danger of unfair prejudice substantially outweighed any probative value of the videos of the high-speed chase and created a substantial risk of unfair prejudice.

{¶111} Generally, all relevant evidence is admissible.

Evid.R. 402; *Hare, supra at* ¶ 13 (5th Dist.). Evid.R. 404(B) provides:

> (B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶112} R.C. § 2945.59 provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶113} Rule 404(B) of the Ohio Rules of Evidence and R.C. § 2945.59 preclude the admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait. *State v. Williams,* 2012-Ohio-5695, ¶16. There are, however, exceptions to the rule. Evidence of other crimes, wrongs, or acts of an accused tending to show the plan with which an act is done may be admissible for other purposes, such as those listed in Evid.R. 404(B); to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶114} In *Williams, supra*, the Ohio Supreme Court set forth a three-party analysis for consideration of admissibility of other-acts evidence:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. Next, the trial court must consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused to show activity in conformity with the character or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B), proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Finally, a trial court is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*See* Evid.R. 403, *Williams,* at ¶¶19-20.

{¶115} "Because R.C. § 2945.59 and Evid.R. 404(B) codify an exception to common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82 (1988). As cautioned by the Ohio Supreme Court in *State v. Lowe*, 69 Ohio St.3d 527 (1994), "... we therefore must be careful ... to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular

crime." *Id.* at 530. Evidence to prove the character of the person the defendant is to show he acted in conformity therewith is barred by Evid.R. 404(B).

{¶116} At the outset, we observe that prior to the testimony of Trooper Miller, the court held a sidebar discussion in which defense counsel voiced a continuing objection to Exhibit 36, the compilation video of other videos showing Appellant's route of travel, the high-speed chase, and including Appellant being removed from the gold car by officers. The objection was overruled. Additionally, during Trooper Miller's testimony the prosecutor played Exhibit 44, Trooper Bice's body camera footage.

{¶117} After Trooper Miller's testimony, defense counsel moved for a mistrial on the basis of the video as improper "other acts" evidence. The trial court overruled the motion. Exhibit 36 was again utilized during Detective Diel's testimony. This time, defense counsel did not object.

{¶118} When the State offered its exhibits, Appellant renewed the objection to Exhibit 44, but did not renew the objection to Exhibit 36. Assuming that Appellant properly preserved objections to both exhibits, we do not find the trial court abused its discretion. Assuming we are limited to a plain error review of the admission of these exhibits, we cannot find that plain error occurred. "An error 'that was not called to the attention of the

trial court at a time when the error could have been avoided or corrected by the trial court' is deemed forfeited absent plain error." *State v. Lawson*, 2025-Ohio-934, ¶ 29-30, (5th Dist.), quoting *State v. Haudenschild,* 2024-Ohio-407, ¶ 15 (5th Dist.). *See also* Crim.R. 52(B). To find plain error, "[f]irst, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights.' We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *State v. Schmelmer,* 2022-Ohio-57, ¶ 109 (5th Dist.), quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Based on the following, we find no merit to Appellant's Fourth Assignment of Error.

{¶119} Our analysis must begin with a determination of whether the other acts evidence is relevant to making any fact of consequence to determination of the action more or less probable than it would be without the evidence. In *State v. Fliger*, 2020-Ohio-753, ¶32 (5th Dist.), the State introduced body camera footage to show the elements of motive and intent for fleeing and eluding the police. In *Hare, supra,* the State introduced testimony of previous unsuccessful attempts to serve Hare with child

custody paperwork and a warrant in order to prove Appellant's knowledge of the child custody papers and Hare's switching vehicles to avoid a deputy. This court found the body cam footage evidence relevant to making a determination of a fact of consequence.

{¶120} In this case, the State offered evidence of the high-speed chase in order to prove identification, the heart of the State's case. The prosecutor pointed out that the initial stop and subsequent chase began one hour after Mr. Troyer was shot. Glenda Troyer, Son, and Matthew Verbeck described the clothing the shooter was wearing at the time of the events. Appellant was still wearing the same clothing when he was apprehended by officers, which included Trooper Miller. The trial court noted that the evidence was necessary to establish the element of identification. We also find the evidence of the clothing Appellant wore during the high-speed chase was relevant for making a determination of a fact of consequence, Appellant's identity.

{¶121} The second step is to consider whether the evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show conformity therewith, or whether the acts evidence is presented for a legal purpose. Here, the evidence of the high-speed chase was also presented for the State's purpose in showing that Appellant had

knowledge and awareness of the incident which occurred at Greenfield Avenue. The trial court gave a jury instruction that Appellant's fleeing alone did not raise a presumption of guilt. The court instructed:

> If you find that the facts do not support the Defendant fled the scene, or if you find some other motive prompted the defendant's conduct, or if you're unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find the facts support the Defendant engaged in such conduct and if you decide Defendant was motivated by a consciousness or awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine, what weight, if any, to give that evidence.

{¶122} We find the testimony was entered for the legitimate purpose of proving, through circumstantial evidence, that Appellant had been at Greenfield Avenue, knew that Mr. Troyer had been shot, and knew that officers wanted to question him in connection with the shooting.

{¶123} The final step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. Appellant argues that the video evidence was not necessary to prove any fact, was simply duplicative, and was utilized for the purpose of casting him in an extremely negative light. We disagree.

{¶124} Here, the eyewitnesses to the shooting could only identify Appellant by association with the gold car. Detective Diels obtained video footage from a local car wash, the first which gave officers any evidence of the license plate on the gold car. From this, Detective Diels was able to obtain Appellant's name by running the plate, and his whereabouts. The evidence was required to tie together the events before, during, and after the shooting. While the State obtained Appellant's clothing, the video evidence was essential to place Appellant in the car, in the clothing, at all relevant times, in order to build a circumstantial case.

{¶125} Based on the above, we cannot say that the video evidence was improperly admitted to prove that Appellant had propensity for criminal acts. The evidence enabled the prosecutor to prove Appellant's identity and also provided evidence of Appellant's awareness of the crime and guilt. The trial court took great pains to make sure the video was edited so that Appellant was not shown wearing handcuffs. The trial court instructed the jury that Appellant's flight did not raise a presumption of guilt and further, that they were to determine the weight to give, if any, to the evidence of the high-speed chase. We do not find that the video evidence was improper character evidence, that it was unnecessary and duplicative, and that the danger of unfair prejudice outweighed the probative value and created a

substantial risk of unfair prejudice. Accordingly, the Fourth Assignment of Error is without merit and is hereby overruled.

ASSIGNMENT OF ERROR THREE - CONSECUTIVE SENTENCE

STANDARD OF REVIEW

{¶126} R.C. 2929.14(C)(4) provides:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*See State v. Shreve*, 2025-Ohio-690, ¶ 5 (5th Dist.).

{¶127} The trial court must make the R.C. 2929.14(C)(4) findings at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings, nor must it recite certain talismanic words or phrases in order to be considered to have complied. *Shreve,* ¶ 6; *State v. Bonnell,* 2014-Ohio-3177, syllabus.

{¶128} In *State v. Glover,* 2024-Ohio-5195, ¶ ¶ 43-46, Ohio Supreme Court has recently clarified the standard of review this Court is to apply in reviewing consecutive sentences:

> Nowhere does the appellate-review statute direct an appellate court to consider the defendant's aggregate sentence. Rather, the appellate court must limit its review to the trial court's R.C. 2929.14(C)(4) consecutive-sentencing findings. In this case, the court of appeals purported to review the trial court's findings. But much of its analysis focused on its disagreement with the aggregate sentence. The appellate court emphasized that Glover's aggregate sentence was "tantamount to a life sentence," 2023-Ohio-1153, 212 N.E.3d 984, ¶ 59 (1st Dist.), and determined that it was too harsh when compared with the sentences that the legislature has prescribed for what the court considered more serious crimes, *id*. at ¶ 97-98. To the extent that the court of appeals premised its holding on its disagreement with Glover's aggregate sentence rather than its review of the trial court's findings, it erred in doing so.
>
> The statute does not permit an appellate court to simply substitute its view of an appropriate sentence for that of the trial court. An appellate court's inquiry is limited to a review of the trial court's R.C. 2929.14(C) findings. R.C. 2953.08(G)(2). Only when the court of appeals concludes

that the record clearly and convincingly does not support the trial court's findings or it clearly and convincingly finds that the sentence is contrary to law is it permitted to modify the trial court's sentence. *Id.*

Thus, an appellate court may not reverse or modify a trial court's sentence based on its subjective disagreement with the trial court. And it may not modify or vacate a sentence on the basis that the trial court abused its discretion. Rather, the appellate court's review under R.C. 2953.08(G)(2)(a) is limited. It must examine the evidence in the record that supports the trial court's findings. And it may modify or vacate the sentence only if it "clearly and convincingly" finds that the evidence does not support the trial court's R.C. 2929.14(C)(4) findings. R.C. 2953.08(G)(2)(a).

Though "clear-and-convincing" is typically thought of as an evidentiary standard, the General Assembly has chosen to use that standard as the measure for an appellate court's review of a trial court's R.C. 2929.14(C)(4) findings. As we have explained, "clear and convincing evidence" is a degree of proof that is greater than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard used in criminal cases. *Gwynne,* 2023-Ohio-3851, at ¶ 14 (lead opinion), citing *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. The appellate-review statute does not require that the appellate court conclude that the record supports the trial court's findings before it may affirm the sentence. Rather, the statute only allows for modification or vacation only when the appellate court "clearly and convincingly finds" that the evidence does not support the trial court's findings. R.C. 2953.08(G)(2)(a). "This language is plain and unambiguous and expresses the General Assembly's intent that appellate courts employ a deferential standard to the trial court's consecutive-sentence findings. R.C. 2953.08(G)(2) also ensures that an appellate court does not simply substitute its judgment for that of a trial court." *Gwynne,* 2023-Ohio-3851, at ¶ 15 (lead opinion).

*See also State v. Shreve,* 2025-Ohio-690, ¶¶7-8.

LEGAL ANALYSIS

{¶129} Appellant contends that the trial court erred by imposing consecutive sentences as it did not make the requisite findings pursuant to R.C. 2929.14(C)(4). Particularly, Appellant asserts that the trial court indicated that consecutive sentences were necessary pursuant to R.C. 2929.14(C)(4)(c) based upon his criminal history. However, the record did not contain evidence that he had any prior criminal charges or convictions prior to the date of the alleged offense on March 10, 2023. Appellant observes that at the sentencing hearing, his trial counsel noted that he did not have prior criminal history as a juvenile or adult. Therefore, Appellant requests that the Court modify his sentences so that each is ordered to be served concurrently.

{¶130} In response, the State argues that Appellant waived this argument because he failed to object to the alleged error at sentencing and thus we are limited to plain error review. The State concludes that because Appellant cannot demonstrate that the outcome of the matter would have changed, no plain error occurred. For the reasons which follow, we disagree with the State's argument. However, because it is not clear what the trial court intended, we vacate Appellant's sentence and remand for resentencing.

{¶131} The sentencing transcript demonstrates that when pronouncing sentence, the trial court stated as follows in open court:

> I've had the opportunity to review the parameters outlined in 2929.11 through 17 of the Revised Code, including the seriousness of the offense and the recidivism factors. I'm also required to give a sentence that would protect the public from further crime and proportionate to this level of crime.

This is the entirety of the language that we may construe as consecutive sentence finding made on the record in open court. It appears to us that this language may be construed as implicit consecutive sentence findings regarding the seriousness of the offense, along with the court's obligation to give a sentence that would protect the public and would not be disproportionate to the level of crime. Given that "talismanic-like" langue is not required, we may find the above language to constitute the first two R.C. 2929.14(C)(4) findings.

{¶132} We also note that after the above language the trial court continued, noting that Appellant led law enforcement on a 100-mile-an-hour chase. The trial court then addressed Appellant as follows:

> Sir, when I consider my sentence, as I watched this trial, the words senseless, chilling, and cold blood came to my mind. I- - I can't really comprehend even how this happened. They didn't know you; you didn't know them. I have no idea how you could shoot anybody in the face

who you don't know, and then fire - - I think it was 13 shots at his son?

There's just no reason for this to have even happened. I mean, it was cruel, vile, heartbreaking, and this family had to sit there and watch this trial, and I cannot imagine what they went through and what they're going through, the pain, today.

{¶133} Arguably, the above language could relate to R.C. 2929.14(C)(4)(b), which is a finding that "at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." However, we obviously cannot be sure of what the trial court intended because the language in the sentencing entry contradicts with an explicit (C)(4)(c) finding as follows:

The Court finds pursuant to Ohio Revised Code Section 2929.14(C)(4) that consecutive sentences are necessary to protect the public from future crime and to punish the defendant, and that consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger the defendant poses to the public. In addition, the Court further finds that the defendant's *history of criminal conduct* demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant. (Emphasis added.)

{¶134} Appellant argues that there was no evidence of criminal history prior to the date of the *offense,* March 10, 2023, which is correct. However, we observe that there was a criminal conviction out of Crawford County prior to Appellant's *sentencing* in March of 2024. The State argues that the trial court simply added the final sentence, which is a (C)(4)(c) finding relating to history of criminal conduct but did not commit plain error.

{¶135} The claim of error here involves an inconsistency between the trial court's oral findings, which appear to make consecutive sentencing findings pursuant to R.C. 2929.14(C)(4)(b), and the written judgment entry which makes findings pursuant to R.C. 2929.14(C)(4)(c). However, because the error had not yet occurred at the time of the sentencing hearing, Appellant would have had no reason to object if he did not intend to challenge the trial court's oral findings. The alleged error was not apparent until Appellant received the written judgment entry at a later date. At that point in time, Appellant had no opportunity to object in the trial court and could only challenge the inconsistency by way of appeal. Thus, the plain error doctrine is inapplicable in this circumstance.

{¶136} However, from the record, it is simply not clear whether the trial court intended to find R.C. 2929.14(C)(4)(b) applied to support consecutive sentences and made a clerical error in the sentencing entry, or whether the court intended to find R.C. 2929.14(C)(4)(c) applied based on the Crawford County case. Thus, we find merit to Appellant's argument that the trial court erred with regard to imposition of the consecutive sentence. Accordingly, we sustain the third assignment of error and vacate Appellant's consecutive sentence. The matter is remanded to the trial court for the purpose of clarifying which R.C. 2929.14(C)(4) finding the trial court intended to make.

## CONCLUSION

{¶137} Based on the foregoing, the judgment of the Court of Common Pleas of Stark County, Ohio is affirmed as to Assignments of Error One, Two, and Four. The Third Assignment of Error is sustained. The matter is remanded for resentencing.